UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | DOCKET NO.: 3:24cr260-MOC |
| | ) | |
| v. | ) | UNITED STATES' SENTENCING |
| | ) | MEMORANDUM |
| TRYSTEN ANTHONY CULLON | ) | |
| | ) | |

Over the course of four days in September 2024, Trysten Anthony Cullon and Jade
Ashlynn Stone, co-conspirators and co-defendants, conspired to defraud victims by stealing
cellular telephones and other personal items, including property from Christopher Tsoulos[1]
("Christopher"), a vulnerable victim, and Victim R.S., and making and attempting to make
transfers using Christopher's CashApp, PayPal, and bank accounts. Following the theft of the
cellular telephones, Cullon and Stone engaged in a cyberstalking and extortive and threatening
text message campaign targeting Christopher, his mother Patricia Buckingham[2] ("Patricia"), and
his brother Michael Tsoulos ("Michael"). Cullon and Stone sent multiple harassing text messages
to Patricia and Michael, threatening to provide derogatory information to Christopher's employer
unless they paid Cullon and Stone $300. Because of the substantial emotional distress caused by
this scheme, Christopher committed suicide and his family and community of friends and loved
ones are left destroyed by the Defendants' reprehensible actions.

I. **Procedural Background**

On December 10, 2025, a grand jury returned an Indictment charging the Defendant with
a wire fraud conspiracy, in violation of 18 U.S.C. § 1349 (Count 1), a conspiracy to commit
extortion, in violation of 18 U.S.C. § 1951 (Count 2), and a conspiracy to commit cyberstalking,

---

[1] With the permission of the Tsoulos Family, the United States is identifying Christopher Tsoulos.
[2] Patricia Buckingham and Michael Tsoulos have also given the United States permission to use their names.

in violation of 18 U.S.C. § 371 (Count 3). Doc. 1. The Defendant pleaded guilty to Count 3. A Factual Basis was filed with the Plea Agreement, which were incorporated, along with the Statement of Relevant Conduct, into the Presentence Report ("PSR"). Docs. 35, 36, and 50 at ¶¶ 5-40.

## II.     Factual Background

On September 5, 2024, Defendant Cullon and Defendant Stone set their conspiracy in motion when, at 2:03 p.m. they created an email address jessiedickens888@gmail.com. Using this newly created Gmail address, at 2:14, Cullon and Stone opened a CashApp account with CashTag "jdickens888." Cullon and Stone then made their way to Planet Fitness in Fort Mill, South Carolina.

At approximately 3:15 p.m. Victim R.S. arrived at the Planet Fitness and went to the men's locker room where he left a bag containing his cellular telephone with phone number ending 6309, among other items.[3] At about 3:25 Cullon arrived at the Planet Fitness and went to the men's locker room where he stole Victim R.S.'s cellular telephone. Cullon exited the Planet Fitness at about 3:40. Minutes earlier, Stone arrived at the Planet Fitness; she went to the women's locker room and exited the Planet Fitness at about 3:54. A female member reported that her items had been rifled through in the locker room, but no items had been taken. At 5:03 Victim R.S. reported that his bag was missing.

On that same day, Christopher was working at Chick-fil-A ("CFA"), in Charlotte, North Carolina. Christopher, who was 37 years old, had autism and was mentally challenged. He loved his job and the people he worked with. As Patricia said:

---

[3] Video surveillance captured these events, though there were no cameras in the locker rooms.

> Chris flourished at CFA…Chris could not understand when
> CFA tried to give him a day off.  Did I do something wrong? He
> would ask. Chris loved his job.  His co-workers became his
> friends…Chris was so very happy.

Doc. 44 -1.  In 2019, Christopher tested at a fourth-grade level in Reading Comprehension and a second-grade level in Math Computation.  He lived with his father and stepmother and never lived alone.  According to his family, if you interacted with Christopher, you would observe and recognize he had a disability based on his speech pattern and body language, among other characteristics.  Christopher had significant weaknesses in short term memory, difficulty with transitions, working independently, and completing tasks.  As reported by family and testing, Christopher was a social and friendly person, but due to his cognitive weaknesses, his judgment was poor and as a result, he was vulnerable to exploitation by others.  He was unable to budget money, count change, or truly comprehend how much things cost.  He needed more direction than others in work situations and was unable to follow other than simple directions on his own.

At approximately 4:42 p.m., Cullon and Stone arrived at the CFA parking lot in Stone's white Mercedes-Benz.[4]  Four minutes later, Cullon exited the driver's side of the car and walked into the CFA.  Cullon, who introduced himself as Tyson, initially asked another employee to use her phone.  She agreed and Cullon used her phone to call Stone at her phone number ending 4552.  After engaging with this employee, who hovered close by as he used the phone, Cullon gave her back her phone.  At 4:52 Cullon approached Christopher and Christopher gave Cullon his cell phone.  Christopher continued working, leaving Cullon unattended with his phone.

---

[4] Again, video surveillance inside and outside of the CFA captured this activity.



After receiving Christopher's phone, Cullon sat down right underneath a security camera and immediately began accessing Christopher's CashApp.[5]



[5] When you open CashApp a green screen appears as seen in this picture of Cullon using Christopher's phone.

4

Cullon attempted three CashApp transfers to "Sabrina" totaling $800. This account was Stone's CashApp, with Account Token ending qmr1. Stone had a second CashApp account with Account Token ending 1yzv, and an account with PayPal, account ending 1063. Cullon separately had a CashApp account with Account Token ending ayf1.

At 4:57 p.m., using Christopher's phone, Cullon sent the following text messages to Stone at her phone number ending 4552.[6]



Cullon returned the phone to Christopher around 5:00 p.m. and left the CFA, returning to the Stone's car. Cullon did not actually need to send this text because Stone and her white Mercedez-Benz never actually left the CFA parking lot. Cullon opened the passenger door and talked with Stone until approximately 5:04 when Stone got out of the passenger side of her car and walked with Cullon towards the CFA.

---

[6] These text messages were retrieved from Christopher's Apple Watch by his family after his phone was stolen.

5



After the two stood outside the restaurant for three minutes, at 5:07 Cullon re-entered the CFA and walked around the restaurant clearly looking for Christopher, even asking at the service counter where Christopher was. An employee appeared to tell Cullon that Christopher was in the back employee area and Cullon walked into the back employee area at approximately 5:09. Two minutes later Cullon quickly exited the CFA, meeting up with Stone in the parking lot.

At approximately 5:12 p.m., Cullon and Stone walked back to the white Mercedes-Benz and Stone entered the driver's side of her car and started driving towards the entrance of the CFA. At the same time, Cullon walked back into the CFA and walked to the back area where Christopher was located. At 5:13, Cullon exited from the back employee area holding a phone, left the restaurant, and entered the passenger side of Stone's waiting car. Stone drove away at approximately 5:14. As they were driving away Cullon and Stone tried to send $500 to Stone's CashApp, claiming the funds were for a car payment, and before 6 p.m. they made four additional attempts to steal money from Christopher.

At just about 5:16 p.m., Christopher emerged from the employee area, ready to leave work. He looked around the dining room and began searching for Cullon, walking out of the

6

restaurant to look for Cullon in the parking lot. At 5:35, Christopher came back into the restaurant and reported to his managers that his phone had been stolen.

Because Christopher's phone was unlocked, Cullon and Stone had unfettered access to the financial applications on his phone, including PayPal, CashApp, and his Bank of America bank account. Between September 5 and September 7, Cullon and Stone persistently attempted to obtain funds from Chistopher's accounts, using multiple financial applications and methods to attempt to steal from him. They tried transferring $5,700 in funds to three different CashApp accounts they controlled – two in Stone's name and one in Cullon's name. But because the family alerted the Bank about the potential fraud so quickly, Cullon and Stone were subverted from receiving any funds and the transactions were refunded.[7]

---

[7] On September 6, 2025, after stealing Christopher's phone, Stone added Victim R.S.'s phone number ending 6309 to her CashApp account ending 1yzv. A search on CashApp for Victim R.S.'s phone number ending 6309 provided a result of Jade Stone, cash tag "$jstoney7."

| Date | Time | Platform | Amount | Subject/Notes | Sender | Sender Account | Recipient | Recipient Account |
|---|---|---|---|---|---|---|---|---|
| 9/5/2024 | 4:53 PM | CashApp | $ 100.00 | | Christopher Tsoulos | qy6d | Sabrina | qmr1 |
| 9/5/2024 | 4:56 PM | CashApp | $ 500.00 | | Christopher Tsoulos | qy6d | Sabrina | qmr1 |
| 9/5/2024 | 4:56 PM | CashApp | $ 200.00 | | Christopher Tsoulos | qy6d | Sabrina | qmr1 |
| 9/5/2024 | 5:14 PM | CashApp | $ 500.00 | car payment | Christopher Tsoulos | qy6d | Sabrina | qmr1 |
| 9/5/2024 | 5:31 PM | PayPal | $1,100.00 | Rent | Chris Tsoulos | 4582 | Jade Stone | 1063 |
| 9/5/2024 | 5:53 PM | CashApp | $1,000.00 | rent | Christopher Tsoulos | qy6d | Sabrina | qmr1 |
| 9/5/2024 | 5:54 PM | CashApp | $1,000.00 | rent | Christopher Tsoulos | qy6d | Sabrina | qmr1 |
| 9/6/2024 | 9:11 PM | CashApp | $ 50.00 | | Christopher Tsoulos | qy6d | Sabrina | qmr1 |
| 9/6/2024 | 9:12 PM | CashApp | $ 50.00 | | Christopher Tsoulos | qy6d | Sabrina | qmr1 |
| 9/6/2024 | 9:13 PM | CashApp | $ 50.00 | dinner | Christopher Tsoulos | qy6d | Sabrina | qmr1 |
| 9/6/2024 | 9:43 PM | CashApp | $ 25.00 | food | Christopher Tsoulos | qy6d | Sabrina | qmr1 |
| 9/7/2024 | 12:56 AM | CashApp | $ 50.00 | gas money ☺ | Christopher Tsoulos | qy6d | Tyson | 1yzv |
| 9/7/2024 | 3:46 AM | CashApp | $ 50.00 | | Christopher Tsoulos | qy6d | Tyson | 1yzv |
| 9/7/2024 | 12:08 PM | CashApp | $ 250.00 | gas | Christopher Tsoulos | qy6d | Trysten Cullon | ayf1 |

Between September 5 and September 7, 2024, Cullon and Stone also made or attempted to make transfers from Christopher's Bank of America account ending x3013 to Christopher's CashApp account. This would have enabled them to then withdraw the funds directly from CashApp.

| Date | Time | Platform | Amount |
|---|---|---|---|
| 9/7/2024 | 5:13 AM | CashApp | $ 25.00 |
| 9/7/2024 | 12:56 AM | CashApp | $ 50.00 |
| 9/6/2024 | 8:04 AM | CashApp | $ 200.00 |
| 9/5/2024 | 5:14 PM | CashApp | $ 500.00 |

When Christopher realized his phone was gone, he "frantically called [his mother] from his manager's phone…Chris was beside himself…he was mad at himself for loaning out his phone. [Patricia] said, 'no Chris, that is who you are, you always want to help others.'" Doc.

8

44-1.  After speaking with Christopher, at 6:09 p.m., Patricia, from her cellphone, sent the

following text message to Christopher's phone:

> To the person that has this phone please return it to Chris at CFA or
> a manager there.  Chris is very upset and management is trying to
> help him get it back.  **This is his mother.** (emphasis added).

On September 7, 2024, at 4:44 a.m., Stone and Cullon sent Patricia the following text

message using Victim R.S.'s phone number ending 6309:

> Your son is a pervert
> and I'm going to let his
> job and everyone else
> in his family know that.
> How dare he work at a
> Christian
> establishment while
> he is going to brothels
> and asking hundreds
> of women online to
> have sex. Unless you
> want me to ruin him
> and embarrass you I
> suggest you provide
> some compensation.
> He will lose
> everything. The things
> I saw were disgusting
> and disturbing.

The allegations in this text and those that followed were absolutely false.  Patricia told

Michael about the text message and provided Michael with the text message and the phone

9

number. Michael then had the following text exchange with Stone and Cullon on September 7, beginning at 3:34 p.m..[8]



At this point in the text exchange, the sender changed from phone number ending 6309 to Christopher's email address.[9] The text exchange continued.

---

[8] The $jdickens888 CashApp account was the account Stone and Cullon created at the start of the conspiracy. *Supra* at p. 2.

[9] Based on phone records, Victim R.S. had his phone number ported over to a new device so that Stone and Cullon could no longer actively use the phone number ending 6309. This occurred during the middle of the text exchange with Michael. At that point, Stone and Cullon had to revert to using Christopher's phone, hence why the sender changed. As seen in the screen shot, the message at 6:26 changed to green. When Victim R.S. was interviewed, the "Don't have cash app, just cash, when you want it?" appeared on his newly ported phone.





11

Christopher was extremely upset after Cullon and Stone took his phone. He was aware of the content of the threatening text messages they sent to his mother and brother and this caused him extreme stress because he was worried he would lose his job at CFA and that, irrationally, he would go to jail because of the threats. Given his intellectual challenges, Christopher could not logically and commonsensically process the text messages.

John shared the following:

> The night before he died, I was helping Michael (his brother) with something and Christopher was so upset. I fixed Christopher something to eat and took it home, but he did not eat it at all. Christpoher had waited for me that night to go home. He never sat right next to me on the couch all these years and that night, I was watching TV and Christopher sat next to me and said – "I'm going to lose my job and I'm going to jail." I told him "No, Christopher, you did not do anything wrong and everyone loves you." He fell asleep next to me, but would wake up every little bit and kept saying the same thing…he was so worried to lose his job or of what would happen to him because of what the defendants had threatened him with.

Doc. 50-1.

On September 8, 2024, in the early morning hours, Tsoulos died from a self-inflicted gunshot wound in the front yard of his residence. As his mother said "Chris, in his child-like mind, saw no way out, so he killed himself." Doc. 50-1. At 7:00 a.m. his father found him. "He was on my front doorstep and I opened the door to find him there. I will never forget that image. Every time I open that door, I see that picture in my mind." *Id*.

### III. Advisory Guidelines

The Supreme Court has declared that "[a]s a matter of administration and to secure nationwide consistency, the [United States Sentencing] Guidelines should be the starting point and the initial benchmark" for sentencing. *Gall v. United States*, 552 U.S. 38, 49 (2007).

The PSR adopted the calculation agreed to in the plea agreement. Doc. 36 at ¶ 8. The base offense level, pursuant to U.S.S.G. § 2A6.2(a), is 18, and because the offense involved an aggravating factor (U.S.S.G. § 2A6.2(b)(1)(B)) – bodily injury – the offense level is increased by 2-levels. *Id*. and Doc. 50 at ¶ 47. The offense level is further increased by two-levels because the defendant knew or should have known the victim of the offense was a vulnerable victim. Doc. 50 at ¶ 49; U.S.S.G. § 3A1.1(b)(1). The Defendant's entry of a guilty plea was timely for purposes of U.S.S.G. §3E1.1(b). *Id*. at ¶¶ 54-55. Accordingly, the PSR calculated the final total offense level as 19, a Criminal History category II, with a resulting guidelines range of 33 to 41 months. *Id*. ¶¶ 56, 72, and 102.

IV.     **18 U.S.C. § 3553(a) Sentencing Factors**

The Court must consider the § 3553(a) factors in fashioning a sentence that is sufficient, but not greater than necessary, to achieve the goals of sentencing. The Court must also avoid unwarranted sentencing disparities. The nature and circumstances of the offense, the history and characteristics of the Defendant, the need for the sentence to reflect the seriousness of the offense, to provide just punishment, to afford adequate deterrence, both specific and general, and to protect the public from further crimes of the Defendant support a sentence of 33 months in prison.

A.     **Nature and Circumstances of the Offense, Need for the Sentence to Reflect Seriousness of the Offense, and to Provide Just Punishment for the Offense**

The Defendant's conduct is incontrovertibly malicious; Cullon demonstrated a complete disregard for human life, preying on Christopher's disability, and forever altering the lives of Christopher and his family. As a result a lengthy sentence is needed to reflect the seriousness of the offense and to provide just punishment.

The chain of events and the decisions made by Cullon and Stone provide the Court with

13

stark insight into their knowledge and bad intent. The United States submits that the interactions with Christopher at the CFA, the timing of the attempted money transfers, and the content of the text messages speak volumes about the nature and circumstances of the offense. After interacting with Christopher, Cullon returned to Stone's car and spent four minutes talking with Stone. While only the Defendants were privy to these conversations, the United States submits that at that point in time, the evidence shows that Cullon had attempted several CashApp transactions to Stone's accounts. Once back at the car, it is likely that they could see the transactions did not go through and a decision was made not to walk away and cut their losses, but instead to return to the CFA to try again. Cullon and Stone walked back to the CFA together and Cullon entered the restaurant proceeding to the back employee area where Christopher was changing. Two minutes later Cullon exited the CFA for a second time and met with Stone in the parking lot. The United States submits that it was then that a decision was made to steal Christopher's phone because Cullon returned to the CFA for a third time and Stone moved her car to the front of the restaurant for a quick getaway. Cullon found Christopher, took his phone, and jumped into Stone's waiting vehicle. As they were leaving the parking lot, another attempted transfer was initiated from Christopher's CashApp to Stone's CashApp.

Also revealing are the text exchanges, starting with the text message from Patricia to Christopher's phone when it was first stolen. Cullon interacted with Christopher and at a minimum knew he was a grown man with a job. But, as noted previously, if you interacted with Christopher, you would know he had intellectual challenges. Even more illuminating, Christopher's mother is texting asking for his phone to be returned. Having a grown man's mother text on her adult son's behalf, identifying herself as such is not a normal response from a

14

fully functional adult. After Patricia's text but before sending the threatening text at 4:44 a.m. on September 7, Cullon and Stone made eight attempts to steal money through Christopher's CashApp and bank account.

Another informative example comes from the threatening text messages with Michael. Cullon and Stone referenced Christopher's manager at CFA, Marvin. There is no way for Cullon and Stone to have known such personal details unless Cullon spoke with Christopher. This level of specificity in the threatening text messages pierced Christopher's confidence because Marvin and his other co-workers were such valued members of Christopher's daily life. Telling Patricia that "he will lose everything" and connecting that to Christopher's employment also shows that Cullon and Stone understood the importance of this job. As Patricia said: "Chris was inconsolable. The thought of losing his beloved job, of Marvin and Collette thinking he was a bad person, of disappointing his family. His world was collapsing. These people made him feel like he was worthless." Doc. 44-1. Cullon and Stone accomplished their threatening goal – they "ruined him." *See* Text message at p. 9.

### B. History and Characteristics of the Defendant

The Defendant's history and characteristics evidence a record of criminal convictions and arrests, though most of these convictions do not result in criminal history category points. Of significance, the Defendant has a 2019 conviction for strong arm robbery where, using a weapon, he stole a 9mm Glock 17 he was purportedly buying from someone he met online. Further, the PSR reports that Cullon has several pending charges that bookend the conduct in this case and also involve Stone. Doc. 50 at ¶¶ 77-84. Similarly, on September 4, 2024, thefts were reported at a Planet Fitness in Charleston. Several victims reported that their backpacks or gym bags were

15

stolen, along with their car keys, wallets, and other personal items. One particular victim, W.H., stated that his iPhone was stolen, along with his credit and debit cards. W.H. advised that after being stolen, charges were made on his card. Another victim, N.F. reported that his card was used at a gas station in Cayce, SC, but because he had a fraud alert the transaction did not go through. A Planet Fitness employee was able to identify suspicious activity on the security camera footage and identified Cullon as the subject; the employee knew Cullon as he had been a member, though he did not have an active membership at that time. The video showed Cullon saying he was going to work out and go into the locker room and then exit the building. The employee was also able to identify Stone as Cullon's girlfriend. The security footage captured Stone's Mercedes-Benz on the road where the Planet Fitness was at or around the time of the theft.

The next day, Cullon and Stone made their way to the Charlotte area to commit the instant offense. Flock and phone data show that they then made their way through Tennessee and up to Michigan, committing fraud along the way.

On September 11, 2024, W.H. advised that his debit card had been used at several stores in Charleston and also in Knoxville, Tennessee, including at a Cracker Barrell. There were also charges on September 11 in Newport, Tennessee and an online purchase at Expedia on September 9. Law Enforcement was able to obtain video from several of the locations. At one, Stone's car pulled in and Cullon made a purchase. Another surveillance video showed Cullon attempting to use the cards in additional locations. On September 13, 2024, when they arrived in Michigan, Stone pawned W.H.'s stolen phone. On the EcoATM, Cullon was captured in the pictures standing behind Stone.

16

On September 16, 2024, a larceny was reported at a Planet Fitness in Oak Park, Michigan. A client came back from a workout and noticed his bag was missing which contained several credit cards, his car keys, and cash, among other items. He notified the banks, but he received emails notifying him that someone had attempted to use his cards. Officers obtained video footage and interviewed staff at the Planet Fitness who stated that a male who used the name Tyson Christian came in and entered the locker room. Video footage showed Stone and Cullon arrived together in Stone's car, and both used the cards to make fraudulent purchases.

### C. Adequate General and Specific Deterrence to Criminal Conduct

On-line extortion and cyberstalking have become all too common, and it is particularly important that the sentence imposed today promotes general deterrence. These types of extortive schemes more frequently impact vulnerable individuals such as teenagers and the elderly. For example, from October 2021 to March 2023, the FBI and the Department of Homeland Security's Homeland Security Investigations (HSI) received over 13,000 reports of financial sextortion of minors. The crimes involved at least 12,600 victims, mostly boys, and led to at least 14 suicides during this timeframe. Meanwhile, the FBI reported over 20 deaths by suicide resulting from financially motivated sextortion.[10] In many ways Christopher was more akin to a teenager and teenagers' developing brains, combined with intense fear and embarrassment, can lead to impulsive, tragic decisions.

Equally important, the sentence imposed should specifically deter Trysten Cullon. Cullon's criminal history exhibits a long pattern of opportunistic crimes. The penal goal of

---

[10] https://www.fbi.gov/news/stories/the-financially-motivated-sextortion-threat#:~:text=They%20are%20among%20the%20resources,threat%20of%20financially%20motivated%20sextortion; *see also* https://www.fbi.gov/how-we-can-help-you/scams-and-safety/common-frauds-and-scams/sextortion

specific deterrence is codified in § 3553(a)(2)(C), which states that the Court must consider the need for the sentence "to protect the public from further crimes of the defendant." This provision "envisions more severe sentences for defendants considered more likely to commit further crimes and less severe sentences for those unlikely to commit crimes." *United States v. Harrington*, 947 F.2d 956, 961 (D.C. Cir. 1991) (*quoting United States v. Rodriguez*, 724 F.Supp. 1118, 1120 (S.D.N.Y. 1989)). The Defendant clearly falls in the former category. The Defendant's actions in this case were calculated, devious, and opportunistic. Knowing that Christopher was mentally challenged Cullon took advantage of his interactions with Christopher to strike at the heart of his disability – his inability to fully comprehend the significance of the texts and to threaten him with the loss of the one thing he loved, his job.

### D. Unwarranted Sentencing Disparities

There have been two recent prosecutions in this District for cyberstalking and interstate threats. In *United States v. Jalon Carlos Torres* (3:21cr71-MOC), this Court sentenced Torres to 27 months in jail following his guilty plea to cyberstalking and interstate threats. Torres' final offense level was 17 with a criminal history category I. In *United States v. Amir Salvatore Khayyat* (3:20cr371-RJC), Judge Conrad sentenced Khayyat to 30 months in jail following his guilty plea to cyberstalking and interstate threats. Khayyat's final offense was 17 with a criminal history category II. While neither of these cases involved an enhancement for bodily injury or vulnerable victim, a sentence of 33 months for Cullon places him on par with similarly situated defendants.

18

## V.    Restitution

Restitution for the victim's estate (or family) is requested in the amount of $46,686.61 for the funeral expenses, memorial luncheon, headstone, and a cell phone.  The Defendant, in his plea agreement, agreed to pay full restitution to all victims directly or indirectly harmed by his relevant conduct.  Doc. 36 at ¶ 9(a) and 18 U.S.C. §§ 3663(a)(3).  Further, under the Victim and Witness Protection Act, 18 U.S.C. § 3663(b)(1) and (b)(3), lost property such as cell phones and the cost of necessary funeral and related services are includable as restitution.

Restitution is requested to be paid to the Christopher Tsoulos's estate or the Tsoulos Family (John Tsoulos) in the amount of $46,686.61 for the following:

- $17,615.69 for funeral expenses for Christopher Tsoulos;

- $19,986.96 for a memorial luncheon;

- $7,883.76 for Christopher Tsoulos' headstone; and

- $1,200 for unreimbursed property loss (Christopher Tsoulos' cell phone).

## VI.    Conclusion

Considerations of deterrence and just punishment, combined with the nature of the offense of conviction, the characteristics of this Defendant, and the need to promote respect for the law warrant a sentence of 33 months in prison.

Respectfully submitted this 6th day of March, 2026.

RUSS FERGUSON
UNITED STATES ATTORNEY

/s/ Caryn Finley
Assistant United States Attorney
United States Attorney's Office
Western District of North Carolina
New York Bar Number: 3953882

19

227 West Trade Street, Suite 1650
Charlotte, North Carolina 28202
Telephone: (704) 344-6222
E-mail: Caryn.Finley@usdoj.gov

20

## **CERTIFICATION**

Pursuant to the Standing Order of this Court entered June 18, 2024, and published to the Bar of the Western District on June 27, 2024, the undersigned hereby certifies:

1. No artificial intelligence was employed in doing the research for the preparation of this document, with the exception of such artificial intelligence embedded in the standard on-line legal research sources Westlaw, Lexis, FastCase, and Bloomberg;

2. Every statement and every citation to an authority contained in this document has been checked by an attorney in this case and/or a paralegal working at his/her direction as to the accuracy of the proposition for which it is offered, and the citation to authority provided.

This the 6th day of March, 2026.


s/ Caryn Finley
Caryn Finley
Assistant United States Attorney

21